UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
DOCKET NO. 1:13CV59

| | | |
|---|---|---|
| BENJAMIN BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the court upon Plaintiff Benjamin Brown's Motion for Summary Judgment (Doc. No. 10), and Defendant Commissioner's Motion for Summary Judgment (Doc. No. 13). Plaintiff seeks judicial review of an unfavorable administrative decision on his application for disability benefits. Having carefully considered such motions and reviewed the pleadings, the court enters the following findings, conclusions, and Order.

### FINDINGS AND CONCLUSIONS

**I. Administrative History**

Mr. Benjamin Brown applied for Title II Disability Insurance Benefits on September 23, 2010 with an alleged onset date of September 24, 2007. (Transcript ("Tr"), 83). His claim was initially denied on November 17, 2010, and was again denied upon reconsideration on February 18, 2011. (Tr 106, 113). Mr. Brown requested a hearing before an ALJ on March 1, 2011, and a hearing was held on July 12, 2011 with ALJ Harold Chambers presiding via video conference. (Tr 12). An unfavorable decision was returned on October 28, 2011. (Tr 9). Mr. Brown requested

1

review of this decision by the Appeals Council, but this request was denied on January 9, 2013. (Tr 1). Mr. Brown filed his claim in this Court on March 6, 2013.

## II. Factual Background

Mr. Benjamin Brown has suffered from back and leg problems since 2006. His treating physician at Forge Mountain Medicine ("FMM") first noted soreness to palpation of his right thigh in August of 2006. (Tr 456). Radiology of his lower spine in November 2006 revealed a congenitally fused lumbar spine from L3 through L5. He presented to the ER with back pain after dragging a deer from the woods. (Tr 469-76). A few days later, he returned to FMM with complaints of severe low back and leg pain with difficulty walking. He had numbness in both legs as well as his perineum. He had reduced reflex in his left knee and normal reflex in his right knee on exam. He also had diminished sensation bilaterally. (Tr 455).

Mr. Brown underwent an MRI on November 27, 2006. It revealed a prominent disc herniation to the left of the midline likely at L4-5. It caused moderate spinal canal narrowing and more prominent left foraminal narrowing. (Tr 495-96). He was seen by Dr. Hoski at Carolina Spine ("CS") the next day. He was noted to be in obvious distress with weight shifted markedly off of his left buttock. On examination, he was noted for marked spasms in his lower back with limited range of motion ("ROM"). He was given an epidural steroid injection. Dr. Hoski diagnosed large central and to the left herniated nucleus pulposus ("HNP") with left L3 and L4 dermatomal pattern of pain. He was also noted for congenital anomalies at L4 and L5. (Tr 516-21). He was able to walk upright after this and so was given another injection on December 19, 2006. (Tr 515). He was still having a fair amount of pain in January 2007, when he received his third injection. (Tr 514). Mr. Brown then tried to return to work. (Tr 513).

Unfortunately, on September 24, 2007, the date he alleged onset of disability, Mr. Brown went to the ER with pain radiating from his lower back into both legs. The clinical impression was sciatica. (Tr 328-29). He started having headaches about a week later. (Tr 478). His right leg pain increased with bending, walking, prolonged standing and riding in a car. He had difficulty sleeping because of his pain. He also had strange feelings in the left side of his face. (Tr 341-45). A new MRI was ordered. It revealed Chiari I malformation of his brain with cerebellar tonsils protruding 7 mm through the foramen magnum to the C1 level of his spine. His lower spine MRI revealed a left central extrusion of the L3-4 disc displacing the left side of the thecal sac and the left L4 nerve root posteriorly. (Tr 346-48). His neurosurgeon did not understand why his symptoms were predominantly on the right side when he had a significant herniation on the left side of his spine. (Tr 350). The Chiari malformation was thought to be responsible for his headaches and facial sensations. (Tr 357).

Mr. Brown presented to Western Carolina Neurology in December of 2007. He presented with headaches, weakness, numbness, back pain and extremity pain. He was assessed with left leg and back pain which could be explained by his L3-4 disc disruption. (Tr 360). Dr. Hoski of CS reexamined him on December 26, 2007. He had severe back pain with aching in his right leg and stabbing pain in his left anterior thigh. On examination, he had a positive straight leg raise test ("SLR") on the left, negative on the right. His symptoms were interfering with his daily living activities. Dr. Hoski told him to remain out of work. (Tr 364-65).

On January 24, 2008, Mr. Brown underwent surgery on his lower back. This included a left L3-4 micro-lumbar discectomy. (Tr 269-74). He initially experienced complete relief of his leg symptoms with continued, aching low back pain that varied in intensity with his activities. Dr. Hoski told him to continue out of work. He was noted for positive SLR's bilaterally as well

as paraspinal muscle spasm. (Tr 375). He then proceeded with physical therapy were he achieved 44 out of 100 possible points for functionality. He experienced an increase in back pain when he tried fishing and rode on his tractor. (Tr 232). In May of 2008, Dr. Hoski noted that he was still experiencing significant left lumbar radiculopathy. He still had a positive SLR on the left. (Tr 378). At the completion of physical therapy, he had 45 out of a possible 100 points in functionality. (Tr 230).

On May 26, 2008, Mr. Brown underwent a repeat MRI. It revealed enhancing scar tissue on the left anteriorly and around the nerve root. (Tr 381). Dr. Hoski noted that there was a recurrent disc protrusion on the left at L3-4. Because of this, he felt he was a candidate for revision decompression above the fusion. (Tr 382). In July of 2008, Mr. Brown underwent surgery on his lumbar spine for a second time. This included a facetectomy, foramintomy and discectomy at the L3-4 level. He then underwent bone grafting with instrumentation for the fusion. (Tr 239-68). He was continued out of work after the surgery. (Tr 386). Mr. Brown again experienced some improvement in his leg pain immediately following the surgery. He tried to attend Bible College to retrain himself for a physically less demanding career. (Tr 391). He then underwent additional physical therapy from October through December 2008. (Tr 278-86).

By April of 2009, Mr. Brown was experiencing more leg pain in addition to his back pain. (Tr 411). He complained of fatigue and decreased energy to Dr. Smith in May of 2009. His ROM was intact. (Tr 448). Mr. Brown underwent another MRI in July of 2009. It revealed an extreme postero-left lateral disc protrusion at L5-S1 which appeared to compress the exiting L5 nerve root. (Tr 435). In March of 2010, Mr. Brown saw Dr. Hoski again regarding his leg pain. His had numbness in his feet since before Christmas. He also had some anterior right thigh pain which was increased with sitting and improved with lying down. He was still trying to take

classes to become a minister. His motor strength was good on examination. (Tr 426). Dr. Hoski ordered a nerve conduction study to assess the source of his pain. He underwent this study in September of 2010. The study was abnormal, demonstrating the presence of chronic right L4 radiculopathy. (Tr 429). Dr. Hoski noted that these findings fit his symptoms and that his nerves had not yet recovered from his surgeries. (Tr 433).

At the end of September 2010, Mr. Brown saw Dr. Smith at FMM regarding severe weakness in his leg. It frequently gave way unexpectedly. He continued to experience head pain as well. He had numbness and tingling in his upper extremities as well as tremor with severe, intractable head pain on a daily basis. He was noted for L4 radiculopathy from his previous surgery and Chiari I malformation with chronic headaches. Dr. Smith thought it was highly likely that he would need to pursue disability and that it was very legitimate in his situation. (Tr 422). At his follow up visit in November of 2010, Mr. Brown primarily complained of low back pain which spread into his left foot. His examination revealed weakness in the left lower extremity. His SLR was negative. He was also noted for upper extremity pain and paresthesias. (Tr 439).

In January of 2011, Mr. Brown had a hard time holding onto things and was frequently dropping items. He awoke at night with pain, numbness and tingling. It happened when he drove as well. Objectively, Dr. Smith noted positive Phalen's sign in his wrist and assessed probable carpal tunnel syndrome. (Tr 438). He was seen by a hand specialist who also noted positive Phalen's and Tinel's signs in his wrists, but his wrist nerve conduction study was negative for carpal tunnel or cervical radiculopathies. (Tr 457-64). He underwent another lumbar MRI in June of 2011 which was consistent with prior imaging studies showing disc bulging and osteophytes at L4-5 as well as congenital fusion at L5-S1. (Tr 525-26).

On July 7, 2011, Dr. Smith gave his medical opinion on Mr. Brown's functional status. He noted that Mr. Brown was suffering from pain which was made worse with movements of the spine such as twisting, reaching, pushing, pulling and squatting. He could not stand for prolonged periods of times (up to 6 hours in an 8 hour day) due to his pain and could not sit for prolonged periods either. He would have to change positions frequently at unpredictable intervals due to pain. He would have to lie down at times during the day to relieve his pain. Dr. Smith also noted that he could not bend frequently due to pain. His experience of pain would often interfere with his ability to attend and concentrate. (Tr 532). Dr. Smith found he would sometimes need to take unscheduled breaks during the day and that he would probably be absent from work about 3 times per month. (Tr 533).

At the request of the ALJ, Mr. Brown underwent a consultative examination with Dr. Antoinette Wall on August 22, 2011. Mr. Brown explained that he could drive and read and write but that he was limited to lifting less than 10 pounds since his surgeries. On examination, he had reduced ROM in his lower spine. He also had positive SLR's bilaterally and could not heel-toe walk. He was also unable to squat secondary to back, hip and leg pain. He had reduced reflexes in his legs. He was still able to manipulate objects in his hands. Dr. Wall assessed lumbar degenerative disc disease ("DDD") with chronic back pain, cervical DDD and Chiari malformation by history. (Tr 534-36).

## III.  Standard of Review

The only issues on review are whether the Commissioner applied the correct legal standards and whether the Commissioner's decision is supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Review by a federal court is not *de novo*, *Smith v. Schwieker*, 795 F.2d 343, 345 (4th

Cir. 1986); rather, inquiry is limited to whether there was "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, *supra*. Even if the undersigned were to find that a preponderance of the evidence weighed against the Commissioner's decision, the Commissioner's decision would have to be affirmed if supported by substantial evidence. *Hays v. Sullivan, supra*.

## IV. DISCUSSION

The court has read the transcript of Plaintiff's administrative hearing, closely read the decision of the ALJ, and reviewed the extensive exhibits contained in the administrative record. The question before the ALJ was whether Plaintiff was "disabled," as defined for Social Security purposes between September 24, 2007 through the date of the ALJ decision. On October 28, 2011, the ALJ found that Plaintiff was not "disabled" at any time between September 24, 2007 and the date of the ALJ decision.

A five-step process, known as "sequential" review, is used by the Commissioner in determining whether a Social Security claimant is disabled. The Commissioner evaluates a disability claim under Title II pursuant to the following five-step analysis:

(1) Whether the claimant is engaged in substantial gainful activity;

(2) Whether the claimant has a severe medically determinable impairment, or a combination of impairments that is severe;

(3) Whether the claimant's impairment or combination of impairments meets or medically equals one of the Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) Whether the claimant has the residual functional capacity ("RFC") to perform the requirements of his past relevant work; and

(5) Whether the claimant is able to do any other work, considering his RFC, age, education, and work experience.

20 C.F.R. §§ 404.1520(a)(4)(i-v).

In this case, the Commissioner determined that Plaintiff was not disabled at the fifth step of the sequential evaluation process. Specifically, the ALJ found at Step 1 that Mr. Brown met the disability insured status requirements through December 31, 2013 and that he had not engaged in substantial gainful activity since his alleged onset date of September 24, 2007. (Tr 14). At Step 2, the ALJ determined that Mr. Brown had the following severe impairments: status post fusion surgery, DDD, herniated discs at L3-4, congenital anomalies at L4-5 with radiculopathy, right lower extremity pain, scoliosis, Chiari I malformation, headaches, facial sensations, status post second laminectomy and wound infection. *Id*. He then found at Step 3 that Mr. Brown did not meet a disability listing. (Tr 15). At Step 4, he found that Mr. Brown had the RFC to perform a reduced range of sedentary work. He would need a sit/stand option and would only be allowed to take normal breaks during the workday. He was limited to occasional pushing and pulling with his extremities and only occasional overhead reaching bilaterally. He could climb ramps and stairs occasionally, but could not climb ladders or scaffolds. He could frequently balance and occasionally stoop. He could never crouch, kneel or crawl. He needed a work environment without extreme temperatures or vibrations and was limited to the performance of simple, routine and repetitive tasks. (Tr 16). The ALJ then found that Mr. Brown was not capable of performing his past relevant work as a truck assembler and mechanic. (Tr 22). He concluded, however, that Mr. Brown was not disabled because there were other jobs he could perform as an assembler, bench hand and hand trimmer. (Tr 22-23).

Plaintiff has made the following assignment of error: The ALJ erred by giving little weight to the medical opinion of Plaintiff's treating physician. The regulations state that "If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted." Soc. Sec. Ruling 96-2p; see also 20 C.F.R. § 404.1527(d)(2). Only where there is significant evidence which contradicts the medical opinions of the claimant's treating physicians, can these opinions not be given controlling weight in the case. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

The ALJ refused to give controlling weight to the medical opinion of Dr. Smith, Mr. Brown's treating physician. The ALJ stated that he gave little weight to Dr. Smith's opinion because the medical records from Carolina Spine were "more comprehensive" and that Dr. Smith's treatment of the claimant was more of a "conservative and routine nature." (Tr 21). However, the ALJ does not point to inconsistent objective medical evidence justifying his rejection of Dr. Smith's opinion. He vaguely states that that the records from Carolina Spine show the claimant's condition "improved over time." (Tr 21).

The objective evidence supports Dr. Smith's opinion. Nerve conduction studies revealed radiculopathic pain in Mr. Brown's right leg and his MRI revealed a far left disc protrusion which compresses his left L5 nerve root. (Tr 435). Dr. Smith also observed objective weakness in his left leg in November of 2010. (Tr 439). Because the evidence demonstrates an objective basis for Mr. Brown's pain and weakness which both Drs. Smith and Hoski acknowledged, the ALJ was not free to reject Dr. Smith's medical opinion. This rejection was harmful to Mr. Brown's case as the vocational expert ("VE") testified that if an individual were absent from work 3 times a month, he would not be employable full time. The VE also testified that

unscheduled breaks and the need to lie down on and off throughout the day to relieve pain would be inconsistent with working full time. (Tr 75-78).

The ALJ also states that he found Dr. Smith's opinion to be "inconsistent with the claimant's demonstrated ability to fish, attend college and drive a tractor." (Tr 21). A review of the transcript of the hearing reveals that Mr. Brown testified that he had not sport fished since 2008 or 2009. Only once or twice a year, he would take his children to the pond down the road from their house and fish by the bank. (Tr 55). He could no longer go out riding the water and fishing like he used to, so he had to sell his boat along with his hunting equipment. (Tr 51). Sitting by a pond and fishing once or twice a year does not demonstrate the ability to engage in full time work. Neither does stepping onto a small tractor and driving it forward just outside the door of a barn – an activity which lasts only a couple of minutes. These activities are "so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace." *Orn v. Astrue*, 495 F.3d 627, 639 (9th Cir. 2007); see also *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). As the Fourth Circuit noted in *Cornett v. Califano*, the ability to perform some tasks on an intermittent basis has never been held to constitute substantial gainful activity. 590 F.2d 91 (4th Cir. 1978). Therefore, these activities did not provide the ALJ with substantial contradictory evidence justifying rejection of the treating physician's opinion.

Mr. Brown's testimony was that after his second surgery in July of 2008, he attended Fruitland Bible Institute for a few semesters. The college was only 7 or 8 miles from his home and he testified that was allowed to get up and walk around during the lectures. He had to stop attending later in 2010 because he could no longer sit or drive long enough to allow him to attend classes. (Tr 17). This is consistent with the record which last noted he was attending classes in March of 2010. (Tr 426). The ALJ's decision suggested that Mr. Brown's testimony was

inconsistent, stating that while he testified to starting courses in April of 2009, the record revealed he started in October of 2008. (Tr 19). But a review of the transcript shows that Mr. Brown testified he was not sure when he started, he only knew it was sometime after his July 2008 surgery. (Tr 37-38). Additionally, it should be noted that Dr. Smith rendered his opinion in July of 2011 and Mr. Brown had to stop attending classes due to his physical condition later in 2010. Therefore, his cessation of class attendance only bolsters Dr. Smith's opinion.

Based upon the foregoing, the Court finds that the decision of the ALJ is not supported by substantial evidence. Plaintiff's Motion for Summary Judgment will be granted, the Commissioner's Motion for Summary Judgment will be denied, and the decision of the Commissioner will be vacated and remanded for a new hearing and decision not inconsistent with this Order.

**IT IS THEREFORE ORDERED** that

(1) Plaintiff's Motion for Summary Judgment is **GRANTED** based upon the ALJ's failure to give proper weight to the Plaintiff's treating physician, and the Commissioner's Motion for Summary Judgment is **DENIED**;

(2) The decision of the Commissioner, denying the relief sought by Plaintiff, is **VACATED** and this action is **REMANDED** to the Commissioner for a new hearing and decision not inconsistent with this Order; and

(3) This action is **DISMISSED**.

Signed: July 1, 2014

Graham C. Mullen
United States District Judge